## E. J. LORD v. TERRITORY OF HAWAII.

### No. 1471.

### ORIGINAL.

TRIAL MARCH 13 TO MAY 5, 1924.          DECIDED MAY 14, 1924.

PERRY AND LINDSAY, JJ., AND CIRCUIT JUDGE ANDRADE
IN PLACE OF PETERS, C. J., DISQUALIFIED.

CONTRACTS—*Territory held not to have warranted subsoil conditions
where piles were to be driven.*

In inviting tenders for the construction of a wharf the Terri-
tory exhibited to intending bidders blue prints showing the
materials found in certain borings made in the site of the pro-
posed wharf and in a large area adjoining thereto. It also
exhibited plans and specifications relating to the construction
of the wharf. The specifications, while specifying the required
breadth and thickness of the concrete piles which were to form
part of the structure and while further specifying the carrying
capacity required of the piles when driven, were silent as to the
lengths of the piles and as to the depths to which they would
have to be driven (except that a certain minimum penetration
was prescribed). One of the general specifications was that
"all bidders must visit the site and familiarize themselves with
the existing conditions, and the successful bidder will be held
to have examined the site, and no extra compensation will be
made by reason of any misunderstanding or error on his part
as regards the site and the conditions thereof." One of the
more particular specifications read as follows: "1.  Sounding:
Previously obtained submarine contours of the portion of the
work where piles are to be driven are shown on the drawings.
Although they indicate approximately the conditions that are
likely to be found, intending bidders must examine the site
of the work, and should satisfy themselves as to the depths
to which piles will have to be driven. Borings: Borings have
been made in the locations as shown on the plans which show
approximately the character of the materials thru which the
piles are supposed to be driven." All of these plans, blue prints
and specifications were made a part of the contract with the
successful bidder.

*Held,* that the Territory did not warrant the nature or the bearing value of the materials to be encountered in the driving of the piles or the depths to which the piles would have to be driven and that on the contrary the contract clearly placed upon the contractor (a) the burden of making such further examinations of the site as might be necessary in order to avoid misunderstandings or error and (b) all the risks involved in determining the lengths in which the piles should be cast and the depths to which they would have to be driven in order to attain the required bearing capacity.

OPINION OF THE COURT BY PERRY, J.

This is an action against the Territory of Hawaii for the recovery of the sum of $40,650.90 for labor performed and materials furnished in connection with the construction of a wharf at Mala on the Island of Maui. It is brought under the provisions of chapter 26 of the Laws of 1895 (now R. L. 1915, ch. 148) whereby the government of Hawaii permitted itself to be sued upon "any contract, expressed or implied," with the government and upon certain other claims. The act referred to invested this court with exclusive jurisdiction in such cases and with the power to "determine all questions of fact involved without the intervention of a jury" (R. L. 1915, Sec. 2663).

The essential allegations of the declaration are that on January 11, 1921, the plaintiff entered into a written contract with the Territory of Hawaii for the construction of the Mala wharf in accordance with certain plans and specifications for the sum of $204,830.90; that he made his bid and entered into the contract in reliance upon the showing made by certain boring sheets furnished by the Territory which represented, as it is alleged, the nature of the materials to be encountered in the driving of the piles which were required by the contract to be driven as a part of the wharf and that these representations proved to be untrue and misleading; that "by said plans and specifications it was made to appear that where

piles were required by said plans and specifications to be driven, the materials to be penetrated consisted of coral rock, tree coral, finger coral, sand and shell in various combinations and proportions, and no other materials whereas, in fact, in most instances the piles in being driven penetrated strata of soft material without bearing value resembling muck or mud, a substance entirely different from that represented by the said plans and specifications and of such a nature and character that a resistance equal to the required carrying value could not be obtained for said piles without driving them to a very much greater depth than said plans and specifications indicated would be required;" that "because of the fact that the nature and character of the materials actually encountered in driving the piles to the depth and at the places required by said plans and specifications were different from that indicated by the plans and specifications and by the report of the borings made by the defendant * * * it was impossible to secure the carrying value for said piles prescribed in said plans and specifications without driving or sinking piles of a much greater length and to a very much greater depth than provided for in the said plans and specifications and to a depth which would require a pile of greater length than could be cast and handled;" that therefore "it became necessary to sink piles of a feasible length and then to place a concrete socket pile on top of each pile so sunk, the same then being driven to a proper depth to give to said pile the carrying value called for in the plans and specifications;" that all of this was done by the plaintiff; and that the cost and the reasonable value of the extra materials and labor rendered necessary and furnished in consequence of these changes were the sum sued for.

The claim is stated in the petition in three counts but its substance is as above summarized.

In its answer the defendant denied that any untrue or misleading representations were made in securing the bid and contract, that in the prosecution of the work no materials were encountered which were not shown by the boring sheets and that the alterations permitted by the Territory to be made after a portion of the piles had been driven were made solely for the plaintiff's benefit in order to enable him to make use of certain concrete piles which he had precast and which experience showed were too short and were made with the protestation by the Territory that it would not be liable for any extra compensation to the contractor therefor.

The trial in this court began on March 13 and ended on May 5. Evidence was taken on thirty-one separate days. Its transcript covers more than twenty-five hundred pages. Twenty-eight witnesses gave testimony. These included the plaintiff; L. L. McCandless, a financier who made considerable loans to the plaintiff for the carrying out of the work; nine men who worked in various capacities on the job; three men who served as inspectors on behalf of the Territory during the progress of the work; A. H. Hobart, who made the borings which are involved in the controversy; L. H. Bigelow, chairman of the Board of harbor commissioners which awarded the contract and himself a civil engineer; four experts called by the plaintiff; six experts called by the defendant; and two other witnesses on lesser subjects. Upon the more important issues, to wit: as to the nature of the materials actually encountered in driving the piles and how certain of the piles progressed while being driven; as to the number of test pipes ($\frac{3}{4}$-inch) forced into the ocean bottom by the plaintiff and as to the results of those probings; as to the reading and interpretation by experts of the notes on the boring sheet defining the materials encountered by the borer; as to the uniformity or irregularity of

the ocean bottom at Mala in particular and of coral bottoms in this Territory in general; as to the bearing values of certain materials (other than hard rock and water); and as to the practicability of engineers and contractors ascertaining in advance the bearing value of materials (other than hard rock and water), without actual experiments by the driving of test piles,—upon all of these issues the evidence was highly conflicting. This was true upon matters of fact as well as upon matters of opinion. It will serve no useful purpose to state in detail why we place greater reliance, in making our findings, upon the testimony and the opinions of some of the witnesses than we do upon those of others. Suffice it to say that we have seen and heard all of the witnesses and formed impressions as the trial progressed concerning the weight of their statements and the soundness of their views.

Beginning with December 1, 1920, the board of harbor commissioners, which under the law was authorized to represent the Territory in this respect, published a call for tenders for the construction of a reenforced concrete wharf at Mala, stating in said call that the bids would be opened on January 3, 1921, and that copies of the plans and specifications of the proposed wharf would be furnished to prospective bidders. A part of the information furnished to the plaintiff and other bidders was a blue print (the copy in evidence is Plaintiff's Exhibit 2 and is marked "H. C. 347.2") showing graphically the materials found in thirty-seven borings scattered over an area of about forty acres (about one-quarter of a mile by about one-quarter of a mile), inclusive of the site of the proposed wharf, this area including to a slight extent land above high-water mark but in the main being ocean bottom. The borings marked "E1," "E2," "E3," "E4" and "E5" were on the site of the proposed wharf and of the wharf as later actually built and are at distances from

each other varying from one hundred and seventy-five feet to two hundred and twenty-five feet. The thirty-seven borings are at distances from each other varying from one hundred and twenty-five feet to four hundred and seventy-five feet. The following are some of the descriptions given on the boring sheet of materials encountered in the E line of borings: "hard coral rock;" "hard-packed sand;" "soft coral rock with pockets of sand;" "medium coral rock with pockets of sand and shell;" "tree coral hard-packed with sand and shell;" "finger coral hard-packed with sand and shell;" "sand and shell;" "medium coral rock and sand pockets;" "soft coral rock with pockets of sand and shell;" "soft coral, sand and shell;" "medium coral rock;" "loose finger coral, sand and shell;" and "soft coral rock and sand." In other borings are noted, in addition to the foregoing: "loose finger coral with sand and shell;" "finger coral packed hard with sand and shell;" "hard-packed sand and shell;" "soft coral rock with loose sand and shell;" "medium coral rock with large pockets of sand and shell;" and "finger coral with sand and shell" without any qualifying adjective. (Boring D7.)

The plaintiff, in preparing to bid, studied this boring sheet, asked some questions of Hobart, the engineer who made the borings for the Territory (eliciting, however, nothing materially different from the showing of the blue print), and during parts of the morning and afternoon of one day walked back and forth on the beach at Mala bay for a distance of a mile or more—perhaps wading into the water to the depth of about one foot—but made no other examination into the nature of the ocean bottom at or near the site of the proposed wharf. Before bidding he made no borings of his own and drove no test piles. There was no pre-existing wharf on the site. The examination which he did make was clearly inadequate to give him

any light as to the nature of the materials to be encountered in the ocean bottom.

Did the government warrant the nature of the materials to be encountered in driving the piles? In inviting tenders and in exhibiting the boring sheets (Plaintiff's Exhibits 1 and 2) to intending bidders including the plaintiff, the Territory said, as a part of what is known as the "general" specifications, that "all bidders must visit the site and familiarize themselves with the existing conditions, and the successful bidder will be held to have examined the site, and no extra compensation will be made by reason of any misunderstanding or error on his part as regards the site and the conditions thereof." This language is broad enough to cover the physical conditions in the ocean bottom and misunderstandings, errors and disappointments relating to the lengths to which piles would have to be driven; but the government spoke with even greater directness in section 6 (marked "Special Requirements") of the more particular specifications. It there said: "1. Sounding: Previously obtained submarine contours of the portion of the work where piles are to be driven are shown on the drawings. Although they indicate approximately the conditions that are likely to be found, intending bidders must examine the site of the work, and should satisfy themseles *as to the depths to which piles will have to be driven.*

"Borings: Borings have been made in the locations as shown on the plans which show approximately the character of the materials thru which the piles are supposed to be driven." One of the blue prints exhibited to the plaintiff and other bidders showed the submarine contours as found by the agents of the government. That is, these representations relate to the depths of the water at different points in and near the location of the proposed wharf. The contention on behalf of the plaintiff is

that the pronoun "they" in the expression "although *they* indicate approximately the conditions that are likely to be found" refers to the submarine contours and that the caution to intending bidders, contained in the same sentence, that they must examine the site of the work refers to an examination or checking of the depths of the water in the ocean down to the surface of the ocean bottom. This contention cannot be sustained. Paragraph 1 and its caution would be practically futile and meaningless if it were held to refer merely to the depths of the water. Soundings intended for the ascertainment of depths of water such as those involved in the Mala wharf undertaking, that is to say, down to about thirty feet, are easily made and are not susceptible of errors of any consequence. It follows mathematically that where the depth is ascertained by sounding to be twenty feet, twenty feet of length of pile will be consumed in covering that distance. There is practically no room for doubt or error in this matter of soundings and estimating length of piles required to penetrate the water; but there is room for much doubt and uncertainty concerning the nature of materials unseen composing the bottom of the ocean. The pronoun "they" in our opinion refers to the drawings mentioned in the first sentence of paragraph 1 of section 6. It is of no particular consequence that the second sentence of paragraph 1 *precedes* the sub-paragraph of paragraph 1 entitled "Borings." It may as well have been in some entirely distinct part of the specifications. The sheet giving submarine contours aside from giving the depths of the water did not and was not intended to set forth any other of the "conditions" likely to be found. The fact that "conditions," more than one, are there mentioned confirms the view that the pronoun refers to the drawings and not to the contours. We are satisfied that the second sentence of paragraph 1 was

intended as a caution to bidders against placing too great
reliance upon the showing of the borings and of the neces-
sity or wisdom of making further examination concern-
ing all of the "conditions" which would be material in
determining the depth to which piles would have to be
driven.   If the English language is ever to be relied
upon as a medium of communication and of expressing
thoughts and terms, the language used in these caution-
ary provisions is certainly clear and unambiguous.   The
whole controversy in this case revolves around the subject
of the depths to which piles would have to be driven;
and the plaintiff entered into the contract in the face of
a direct warning by the employer that the conditions
likely to be found were only "approximately" indicated
by the drawings and that he must examine the site of
the work and satisfy himself "as to the depths to which
piles will have to be driven,"—the very subject concern-
ing which miscalculation and disappointment subsequent-
ly occurred.   This construction, to the effect that it was
endeavored by the specifications to make known to in-
tending bidders and to the plaintiff that the government
did not feel certain as to the conditions that would be
encountered in driving the piles is further emphasized
by the statement, in the sub-paragraph relating to bor-
ings, that the boring sheet showed approximately "the
character of the materials through which the piles are
*supposed* to be driven."   The use of this word "supposed"
is significant.   The bidders had in the preceding para-
graph been warned to satisfy themselves as to the depths
to which the piles "will *have to be* driven" and in this
paragraph were told that the borings showed approxi-
mately the materials through which the piles are "sup-
posed to be" driven.   Why this contrast unless it was in
order to show in this second way the doubt that was

felt and held out concerning the nature and the bearing value of the materials then unseen?

The wisdom and the necessity of reporting as doubtful that which was doubtful and of placing upon the contractor the burden of making his own examination and of proceeding at his own risk in bidding and in performing the work are made even clearer by certain facts which we find from the evidence in this case. One of them is that although the wharf was to be nine hundred and sixty-two feet long by thirty feet wide in the part called the "approach" and fifty-two feet wide in the part called the wharf proper, or a total area of about thirty-six thousand square feet, nevertheless only five borings were shown by the boring sheet to have been made within the area to be occupied by the structure and these at distances from each other varying from one hundred and seventy-five feet to two hundred and twenty-five feet. Another one is that ocean bottoms along the shores of this island, as well as of the other islands of this group which are composed in whole or in part of coral, are as a rule extremely irregular with reference to the formations and the nature of the materials encountered not only at various depths but in various parts of limited areas. The evidence overwhelmingly shows the fact of these gross irregularities. Whether due to the fact that originally coral was formed only in ledges here and there or with holes or caverns here and there or whether holes or caverns or "pockets" as they have been called in the testimony were later formed by erosion or by decomposition of the coral through contact with fresh water or otherwise need not be considered. The fact remains that, with perhaps rare exceptions, former coral bottoms forced above the level of the ocean by volcanic action and those now two or three feet below high-water mark show these same irregularities, that is, hard coral in places varying

in thickness from about a foot to many feet, immediately adjoining them abrupt drops from a foot or so to many feet, and these pockets or depressions either occupied by water only or by sand or disintegrated coral or possibly other soft materials. To judges born and reared on this island or resident here for many years these facts in reality require no proof. The evidence further abundantly shows that in driving piles in coral bottoms under the ocean a very few feet of distance between piles will bring about very marked differences in the depths to which piles of the same size and nature would have to be driven in order to attain the same bearing capacity. It is even in evidence that in driving dolphins with the piles touching each other some piles have to be driven very much deeper than other piles touching them.

It would have been the height of folly, therefore, for the government to have represented that because borings E1 to E5 showed certain materials therefore the remaining parts of the wharf with the three hundred and thirty piles or thereabouts required to be driven would all be found to contain the same materials, of the same thicknesses and at the same depths. We think that no such representation was made in the specifications or contract and that the language used sufficiently shows an intention to disclose that there was uncertainty as to the nature of the materials to be encountered and that the contractor must assume the risk of ascertaining the lengths to which piles would have to be driven and therefore the lengths in which they would have to be cast. The boring sheet itself, it need hardly be stated, makes no representation whatever except as to the materials found in the places where the thirty-seven borings were actually made (over an area of about forty acres) and is silent as to what materials would be found in the places where the three hundred and thirty piles would

be driven. There is nothing in the words of the specifications to enlarge the representations made on this blue print.

The specifications require that certain of the concrete piles shall be sixteen inches by sixteen inches and that these piles shall have a minimum penetration into the bottom of the ocean of ten feet and a bearing capacity of thirty tons figured in accordance with the Engineering News formula and that certain other piles shall be eighteen by eighteen inches, with a minimum penetration of fifteen feet and a bearing capacity of forty tons; but the specifications contain not the slightest representation as to the lengths of the piles or as to the depths to which they would have to be driven. These omissions likewise are significant and tend to support the construction which we adopt to the effect that the nature of the materials to be encountered and the depths to which piles would go were matters involved in uncertainty and that the contractor must take upon himself the burdens and risks of these uncertainties. Nor is there anywhere in the specifications or in the boring sheet or elsewhere in the contract any representation whatever as to the bearing value of any of the materials shown on the boring sheet. Judging from a reading of the declaration and from the oft repeated arguments of counsel for the plaintiff one would think that the bearing value of each and all of the materials named on the boring sheet were known matters about which there could be little or no doubt and that all that was necessary would be for the contractor to read a designation of a material and figure out from some formula its bearing capacity. The evidence clearly shows that this is not the case. The bearing value of thick ledges of hard rock at the one extreme, and of water at the other extreme, is susceptible of a considerable degree of certainty but although expert after expert was

specifically questioned by the court on the subject not one of them knew or had ever heard of any book or college or engineer that teaches the bearing value of "soft coral rock" or of "medium coral rock" or of "coral rock mixed with sand and shell" or of "loose finger coral, sand and shell" or of "finger coral, sand and shell" or of disintegrated coral. The proportions in which the loose finger coral, where it is represented on the boring sheet, was mixed with sand and shell are nowhere stated. The different bearing values to be obtained from a combination of these materials would differ almost as greatly as the percentages in which they could be mixed. It seems clear from the evidence that pure beach sand of the variety frequently to be met with on our island beaches has a very high bearing value but that presupposes, of course, that the sand is present in large quantities and is "retained," that is, that it is so situated that the driving of the piles cannot readily push it in one direction or another. A reasonably large boulder even though composed of very hard rock can itself conceivably be pushed out of the way by the pile provided the neighboring substances are sufficiently soft and depending also to some extent upon the shape of the boulder and the portion of it which was struck by the entering pile. So also a ledge or layer of coral even though it might be properly termed hard can conceivably be easily broken through by the pile provided the layer is sufficiently thin and is not supported by other hard materials immediately beneath it. The factors of doubt as to the nature of the materials encountered below the surface of the bottom of the ocean are so many and so varied, certainly in the coral bottoms of these islands and perhaps also in other materials, that, as testified by Mr. Brown, an expert from California, it is impossible to know in advance what materials are to be encountered or what

their bearing values will be and the only way to determine definitely these points is to drive test piles. Doubtless some contractors occasionally prefer to guess and "take a chance" without incurring the expense of test piles or test borings. Plaintiff did this and lost.

Some of the evidence adduced on behalf of the plaintiff would, taken by itself, tend to support a finding that in drawing out a test pile which had been driven at about the forty-seventh or forty-eighth bent, a quantity of lava mud was found adhering to the lower, tapering portion of the pile and also that in making certain probings with an ordinary galvanized iron pipe three-quarters of an inch in diameter the pipe on being drawn out was found tinged with lava mud. The great preponderance of the evidence, however, was, and we find, that lava mud was not encountered anywhere in the location of the wharf and that such "mud" as was found was composed of disintegrated coral, originally of various forms, and disintegrated shells. It is significant that the utmost that the petition charges in this respect is that the objectionable material encountered was *"soft material* without bearing value *resembling muck or mud,* a substance entirely different from that represented by said plans and specifications." There is no allegation that the material *was* muck or mud or that it was lava mud and not coral mud. At the time when the plaintiff and his legal advisers were preparing the strongest possible statement of the facts upon which recovery was asked, they found it impossible, it is fair to infer, to directly charge that lava mud was encountered.

There is no evidence whatever tending to show that lava mud was found in any of the exact places where the E borings were made. Even if lava mud had been encountered in portions of the wharf site, the result of this case would not be affected thereby in view of the

terms of the specifications and the contract as we construe them.

It is contended on behalf of the plaintiff that in the expression used on the boring sheet "loose finger coral, sand and shell," the representation is that the finger coral alone was loose and that the sand and shell were not. This argument appears to be based purely upon the presence of a comma after the word coral. We think this contention cannot be supported. It may be noted in passing that in one instance (Boring A1) the same description, "loose finger coral sand and shell," is used without a comma and evidently without any different meaning being intended. In any event, the mere presence of a comma ought not to be permitted any such weight. Strict grammarians probably would say that the comma was intended to take the place of the conjunction "and" which is omitted. However that may be, there is more in the boring sheet which throws light on the subject. In places the material found is described as "finger coral *hard-packed* with sand and shell." In one place it is noted as being "finger coral sand and shell" and in several places the expression now under consideration is used. The fact that at times the expert described the material as being "hard-packed" would seem to show that he used the word "loose" advisedly in other places in referring to the combination of the same three materials and that he intended to show that in the one class of instances he found these materials "loose" or without bearing value and in other classes of instances found them hard-packed and with considerably more bearing value. The fact that these materials were in some instances described as being loose and not hard-packed should have cautioned the contractor against allotting to them any great bearing value. So also the materials described as medium coral and soft coral were by their

nomenclature left open to doubt as to their respective bearing values. There are different degrees of softness of coral. That material is found in different degrees of disintegration whether hidden in the ocean bottom or exposed on the surface of the earth.

The argument that the time elapsing between the publication of the call for tenders and the opening of the bids was insufficient to permit of a thorough examination of the ocean bottom cannot be sustained in view of the plaintiff's own testimony that if he had devoted himself solely to that examination during that period, the time would have sufficed. Moreover, it requires no evidence to hold that it was always possible for intending bidders to ask for an extension of the time or, failing to receive it, to refuse to bid.

A. H. Hobart who made the thirty-seven borings for the Territory was himself a witness and was cross-examined. We are satisfied that he is a man of high integrity and well equipped by training and experience to make borings in ocean bottoms and elsewhere for the purpose of ascertaining the nature of the materials encountered. In the closing argument counsel for the plaintiff referred to him as "one of the greatest experts, in the making of wash borings, in the United States and perhaps in the whole world." The evidence is undisputed and we find that he made all of the thirty-seven borings with all of the care and skill that such an undertaking is susceptible of, that he truthfully reported to the board of harbor commissioners the materials which he found in each boring as he interpreted them, that he was possessed of a high degree of ability in the interpretation of the materials as they came up through the pipes (these were all "wash" borings) and that all of his readings and reports of the materials found are correctly noted and represented on the boring sheet

(Plaintiff's Exhibit 2). He did not find any materials which are not reported on the sheet and the sheet does not report any materials which he did not find.

In other words, this is a case where there was no misrepresentation whatever by the government of the materials encountered or to be encountered and no incomplete, deceptive or misleading representations. The representations which were made were all true in fact. The board of harbor commissioners did not withhold from bidders any information which it had. It had no knowledge other than that shown on the boring sheets and by certain samples of the materials found in the borings; and these samples were held freely available for the examination of intending bidders.

We find nothing in the cases cited by the plaintiff, from the Supreme Court of the United States, to prevent the adoption of the construction which we do adopt. In *United States* v. *Utah Stage Co.*, 199 U. S. 414, the government made a definite representation that there were two postal stations to be served whereas in truth and in fact there were four. The court held that nothing was left in doubt by the representation. It was grossly misleading to the contractor. In *Hollerbach* v. *United States*, 233 U. S. 165, there was a positive representation that a certain dam "is now backed for about fifty feet" with certain materials there named whereas in truth and in fact the dam was backed in part at least by certain materials radically different from those mentioned. In *Christie* v. *United States*, 237 U. S. 234, the agent who made the borings in one place encountered with his drill sunken logs, moved the drill and made the boring at another place and then reported the materials found in the second boring as though they had been found in the place originally selected for the boring and made no mention of the sunken log or of the chips thereof

which had come to the surface. Although the court
believed that it was merely an instance of mistaken
judgment on the borer's part as to what was essential
to be reported, it nevertheless held that "there was a
deceptive representation of the material and it misled."
In *United States* v. *Spearin,* 248 U. S. 132, the contract
was for the construction of a dry-dock. It included
specifically the relocation of a pre-existing city sewer six
feet in diameter, in accordance with certain plans and
specifications, which relocated 6-ft. sewer was intended
to empty into a pre-existing 7-ft. sewer, as a protection
against flooding the dry-dock site during the construction
of the latter. The specifications did not disclose the
existence of a certain. dam which partially obstructed
the 7-ft. sewer. The government officers who let the con-
tract knew that these sewers had overflowed in the past,
from time to time, but did not inform the contractor of
this fact. After relocation and completion of the 6-ft.
sewer storm waters, meeting the undisclosed dam, over-
flowed into the dock site and impeded its construction.
This was held by the court to be a withholding of a
material fact, a misrepresentation which misled. In
*United States* v. *Atlantic Dredging Co.,* 253 U. S. 1,
there was "omission from the map exhibited to bidders
of" certain of "the actual borings made and their dis-
closures" (p. 10) ; "the maps did not show the results
of all the test borings which had been made;" other
borings "had been made, the results of which did not
appear upon the maps, and the results of which would
have disclosed the fact that material had been encoun-
tered in this area of a far more difficult character than
that shown to have been found in the ten borings which
had been recorded, and would have disclosed the pres-
ence of the kind of material which was actually en-
countered later, when the work was being done under the

contract." (p. 8)   The court held that there "was in fact a deception" (p. 12) and that the contractor "had not been informed of the fact that impenetrable material had been reached by the probe." (p. 4)   In *United States* v. *Smith,* 256 U. S. 11, the contract was to excavate a ship channel at eighteen cents per cubic yard of excavation, scow measure, and the material to be removed was specified to consist of "clay, sand, gravel and boulders, all in unknown proportions," but a natural bed of limestone rock was found within the boundaries of the excavation required by the contract.   It was held that limestone bed rock "was not the material specified in the contract" and that the contractor was not obligated to excavate it under the contract.   There was no provision in the contract in any wise similar to those in the contract now under consideration by way of cautioning the bidders to examine the site before bidding and to form their own conclusions as to the depths to which the piles would have to be driven.

In *MacArthur* v. *United States,* 258 U. S. 6, and *Elkan* v. *Sebastian Bridge District,* 291 Fed. 532, the foregoing cases from the United States Supreme Court are distinguished much as we here distinguish them.

The contention of the plaintiff that the materials encountered were such as to require that the concrete piles otherwise specified in the contract be of such a length that they could not be successfully cast or put in place is not sustained by the evidence.   The plaintiff cast all of the three hundred and thirty piles which he thought would be required in the work before driving any of them.   As thus precast they ranged in length from a little over twenty feet to about fifty-seven feet.   His method of calculation of the lengths required was to take the depth of water plus the minimum penetration prescribed by the contract plus the height required above

the surface of the water plus two feet extra by way of good measure and then to cast the piles in the total number of feet thus arrived at. In other words, the only allowance that he made for inexactness in his estimate of the bearing power of the materials to be encountered in the prescribed depths of penetration was two feet. As finally driven the combination piles, meaning either a wooden pile underneath with a concrete socket and a concrete pile above or a concrete pile below and a concrete socket pile above, varied in length from about sixty-seven feet to one hundred and six feet but there is no evidence from which we can find that plain concrete piles, that is, without sockets, would not have attained the required carrying capacity at considerably shorter lengths and there is evidence that concrete piles as long as one hundred and six feet have been and can be satisfactorily cast, handled and driven. Doubtless it is somewhat more difficult and more costly to handle piles of greater length than it is to handle those which the plaintiff had precast but this cannot alter the terms of the contract or affect the principles involved.

Judgment will be entered for the defendant.

*S. C. Huber* and *U. E. Wild* (*Smith & Wild* and *Huber & Kemp* on the brief) for plaintiff.

*H. R. Hewitt,* First Deputy Attorney General (also on the briefs), for the Territory.